UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> v. <br><br> IRVIN VILNEUS, <br>    Defendant. | ) <br> ) <br> ) <br> ) <br> )    C.A. No. 20-cr-99-MRD-PAS <br> ) <br> ) <br> ) <br> ) |

MEMORANDUM AND ORDER

Melissa R. DuBose, United States District Judge.

Before the Court is Defendant Irvin Vilneus' Motion to Suppress Evidence Obtained in Violation of the Fourth Amendment and memorandum in support ("Mot. Suppress"), ECF Nos. 78, 78-1. The Court held a hearing on this motion on September 19, 2025, at which it heard testimony from law enforcement agents and additional argument from each party. Vilneus is seeking to suppress the fruits of the search of his apartment because the affidavit submitted in support of the warrant contained information—first-hand observations of cash, debit cards, a laptop computer, and a gun—agents obtained during a warrantless search of the apartment earlier that day. For the reasons below, the Motion to Suppress is denied.

I.    BACKGROUND

On November 6, 2020, Irvin Vilneus was indicted on three counts of wire fraud in violation of 18 U.S.C. § 1343 and three counts of aggravated identity theft in violation of 18 U.S.C. § 1028A. The Indictment (ECF No. 14) stems from a federal

investigation into a Covid-era unemployment fraud scheme. As part of the investigation into this fraudulent activity, the following arrest and search warrants were issued:

1) Complaint and Arrest warrant for Irvin Vilneus issued by Magistrate Judge Sullivan on October 8, 2020. ECF No. 82-2;

2) Search warrant for Vilneus' cell-site information issued by Magistrate Judge Sullivan on October 8, 2020. ECF No. 82-2[1], ("Ping Warrant");

3) Three search warrants for physical addresses located in Rhode Island;

4) Search warrants for 6808 Rio Pinar, North Fort Lauderdale, Florida, a white 2017 Inifinti Q60, and for Vilneus issued on October 12, 2020. ECF No. 82-3 at 7;

5) Search warrant for 5401 Wiles Road, Apartment 4-105, Coconut Creek, Florida issued on October 13, 2020. ECF Nos. 78-2 ("Wiles Warrant").

ECF No. 78-1 at 2–3; ECF No. 82-1 at 1–2. Vilneus' Motion to Suppress focuses on the Wiles Warrant, specifically contending that the affidavit in support included information obtained during a warrantless search of the Wiles Road apartment on the morning of October 13, 2020. ECF No. 78 at 1.

In the morning hours of October 13, 2020, law enforcement officials were seeking to execute an Arrest Warrant for Irvin Vilneus. ECF No. 78-1 at 3. Some agents went to 6808 Rio Pinar Drive to locate Vilneus while others went to the

---

[1] The Affidavit in support of the Complaint and Arrest Warrant and Ping Warrant are the same, as the Agent applied for all three simultaneously.

2

Coconut Creek apartment complex. *Id.* The agents who went to the Rio Pinar Drive address were greeted by Vilneus' mother who informed them that Vilneus had moved out of that location.[2] *Id.* Meanwhile, the agents at the Coconut Creek apartment complex were knocking on doors trying to locate Vilneus when a neighbor directed the arrest team to a group of apartments in the back of the complex. *Id.* Importantly, because of the authorized Ping Warrant, agents had been monitoring the location of a cellphone associated with Vilneus and noticed it "pinging" in the area of the Coconut Creek apartments on October 11–13, though the exact location was unknown. *Id.*

Eventually, agents knocked on the door to apartment 4-105 and observed an unidentifiable individual peak through the blinds in the apartment window. *Id.* One to two minutes later someone opened the door and identified himself as Irvin Vilneus. *Id.* at 3–4. At the suppression hearing, Special Agent Quoc Tran Nguyen explained that Vilneus was guided just outside the apartment so the arrest could take place. As he was being guided outside, Vilneus was asked if anyone else was present in the apartment and if there were any firearms present in the apartment. *Id.* at 4. He answered both questions truthfully—nobody else was inside the apartment and he did have a lawfully owned handgun inside. *Id.* Contemporaneously, another group of arrest team agents entered the apartment to conduct a "protective sweep." *Id.*

---

[2] At the hearing held on this motion, Special Agent Quoc Tuan Nguyen identified factors that led him to believe that Vilneus may be located at the Rio Pinar address, including that it was Vilneus' mother's residence and that the internet account was in Vilneus' name. The agent's Affidavit, submitted in support of his request for the Arrest Warrant and Ping Warrant, identifies additional factors connecting Vilneus to that address. *See* ECF No. 78-2 at 27 (explaining that the address was used to register Vilneus' business).

3

"During the protective sweep, officers observed in plain-view on the kitchen counter, a handgun, a laptop computer, cash, and debit cards inside an open pouch." *Id.* A cash counting machine was also found in the closet. *Id.* The agents who testified at the hearing explained that nothing was disturbed during this protective sweep.

At this point, agents had executed the arrest warrant for Vilneus and were preparing to take him to the U.S. Marshals office to be processed. Before being led away from the apartment, Vilneus "asked for some clothing, and specifically, a pair of sweatpants and a shirt from his bedroom." *Id.* The agents complied with Vilneus' request and noted that he was only wearing boxers when he answered the door moments earlier. Agents, again entered the apartment and led Vilneus to the bedroom so he could get a change of clothes. *Id.* During this subsequent entry, agents again noticed in plain-view the handgun, laptop computer, cash, debit cards, and a cash counting machine.[3] *Id.*

While Vilneus was transported to the U.S. Marshals for processing, agents secured the scene and obtained the Wiles Warrant. ECF Nos. 78-2. This warrant was executed later the same day and the search yielded guns, cash, debit cards, cell phones, and a money counting machine, among other items. ECF No. 78-1 at 4. Vilneus now moves to suppress "evidence obtained from the initial [October] 13, 2020, warrantless search of apartment 4-105 at 5401 Wiles Road, Coconut Creek, Florida." ECF No. 78 at 1.

---

[3] The agents also saw a shotgun, but it is unclear on this record whether this was observed during the initial protective sweep, the officers' re-entry to retrieve clothing for Vilneus, or when officers executed the Wiles Warrant.

4

## II.  LEGAL STANDARD

The Fourth Amendment of the U.S. Constitution "protects '[t]he right of the people to be secure in their person, houses, papers, and effects, against unreasonable searches and seizures.'" *United States v. Delgado-Pérez*, 867 F.3d 244, 251 (1st Cir. 2017) (quoting U.S. Const. amend. IV.). "Because the prophylaxis of the Fourth Amendment is at its zenith with respect to an individual's home, a warrantless search of a private residence is presumptively unreasonable unless one of a few well-delineated exceptions applies." *Id.* (quoting *United States v. Infante*, 701 F.3d 386, 392 (1st Cir. 2012)) (cleaned up).  One such exception, and the one at issue here, "is the exception for protective sweeps." *Id.*  The Defendant "bears the burden to show a Fourth Amendment violation." *United States v. Young*, 835 F.3d 13, 19 (1st Cir. 2016) (citing *United States v. Werra*, 638 F.3d 326, 330 (1st Cir. 2011)).  When a Defendant has shown he was subjected to a warrantless search, "the government must bear its burden of proving the search was constitutionally legitimate." *United States v. Manubolu*, 13 F.4th 57, 69 (1st Cir. 2021) (citing *United States v. Rodríguez-Pacheco*, 948 F.3d 1, 6 (1st Cir. 2020)).

If a warrant affidavit contains tainted information, the Court would set aside the tainted information and examine the warrant affidavit for probable cause without the tainted information.  *See United States v. Ford*, 22 F.3d 374, 379 (1st Cir. 1994) (quoting *Franks v. Delaware*, 438 U.S. 154, 172 (1978)) ("When reviewing affidavits containing 'tainted' evidence, courts regularly set aside the tainted information and then determine if 'there remains sufficient content in the warrant affidavit to support

5

a finding of probable cause.'"); see *also id.* (quoting *United States v. Veillette*, 778 F.2d 899, 904 (1st Cir. 1985)) ("[The illegally obtained information] should be set to one side . . . and the remaining content of the affidavit examined to determine whether there was probable cause to search, apart from the tainted averments.").

## III. DISCUSSION

Vilneus is seeking to suppress the fruits of the search of his apartment, arguing that "the protective sweep was improperly based on a lack of information available to police, rather than specific facts . . . to constitutionally justify their warrantless actions." ECF No. 78-1 at 8. The government justifies the warrantless search as a protective sweep by arguing that, "with arrest warrant in hand, officers are permitted to look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." ECF No. 82-1 at 11. They proffer two additional justifications to deny the instant motion: 1) the items were in plain-view when agents returned into the apartment to retrieve clothes for Vilneus, and 2) inevitable discovery because agents would have sought a warrant to search apartment 4-105 to locate items such as laptops and cell phones once it had executed the arrest warrant. Since Vilneus has alleged he was "subjected to a warrantless search," the Court will now examine the government's arguments to determine whether "the search was constitutionally legitimate." *Manubolu*, 13 F.4th at 69 (citing *United States v. Rodriguez-Pacheco*, 948 F.3d 1, 6 (1st Cir. 2020)).

A.  **Protective Sweep**

To justify a protective sweep, officers must have a "reasonable suspicion of danger," which means "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *United States v. Hernandez-Mieses*, 931 F.3d 134, 141 (1st Cir. 2019) (quoting *Maryland v. Buie*, 494 U.S. 325, 334 (1990)). "[A] mere inchoate and unparticularized suspicion or hunch that someone is hiding who could pose a danger to the arresting officers is not enough to support a protective sweep." *Id.* (quoting *Buie,* 494 U.S. at 332). In *Buie*, the Court was clear that "[a] protective sweep also must be limited in scope to 'a cursory visual inspection of those places in which a person might be hiding.'" *Id.* (quoting *Buie*, 494 U.S. at 327).[4]

In *Buie*, police had an arrest warrant for the defendant, and they entered the home to execute the warrant. 494 U.S. at 328. Once inside the house, the officers scattered throughout the first and second floors, and another announced that he would secure the basement. *Id.* The officer announced his presence at the top of the stairs and the defendant came out with his hands up. *Id.* He was arrested. *Id.* Then another officer entered the basement "in case there was someone else" down there, and that officer noticed, and seized, incriminating evidence from the basement. *Id.*

---

[4] While Vilneus contends the entry into the apartment was illegal, he does not specifically argue this prong of the *Buie* analysis which focuses on *where* officers can search during a protective sweep. The Court does not find it necessary to address this part of *Buie* in its analysis.

7

In upholding the denial of the motion to suppress, the Supreme Court first articulated the contours of the modern "protective sweep" and stated, "[t]he Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* at 337.

The First Circuit more recently discussed the issue in *Delgado-Pérez* where the Court found that officers lacked reasonable suspicion to conduct a protective sweep of the defendant's apartment following his immediate surrender outside his home. 867 F.3d at 256. There, police went to the defendant's home to execute an arrest warrant, and when they arrived, he told them that he would open the gate and be right out. *Id.* at 247–48. He also told the officers he was by himself, and eventually exited the house and was arrested on the porch. *Id.* Despite this, "officers undertook a protective sweep of the residence, which, according to one officer, [was] their standard practice to ensure officer safety and prevent destruction of evidence." *Id.* at 248. The Circuit rejected the government's arguments that 1) drug trafficking is violent and usually involves guns, 2) the house had a gate and security cameras, and 3) that the voluntary surrender on the porch allows officers to infer the presence of others lying in wait from inside the residence. *Id.* at 253–55. In rejecting the protective sweep argument, the Court relied on an officer's testimony that they did "a lot of intel work" before the arrest, which involved "doing surveillance" and gathering "all information available" to "make sure that officers knew exactly where

they were going" and to ensure that the execution of the arrest was "as safe as possible." *Id.* at 253. As the Court remarked, "there [was] no indication in the testimony that the pre-arrest 'intel work' resulted in any evidence that another person might be present in the home at the time of the arrest, let alone that another dangerous person would be." *Id.* Moreover, the court was clear that a "lack of information cannot provide an articulable basis upon which to justify a protective sweep." *Id.* at 256. More recently, this court rejected the government's contention that the search of a residence after a defendant was arrested just outside the house was a valid protective sweep. *DaCruz*, 694 F. Supp. 3d at 198 (concluding that "the officers [] did not have reasonable suspicion to believe a person in the apartment posed a danger to them" because "[t]here was no evidence of violence at or near [the residence], no particularized reason to believe Defendant's girlfriend or anyone else was armed and dangerous, and no particularized evidence that anyone was in the residence.")

Whether the search in this case is a valid protective sweep or an illegal search is a fact intensive inquiry aimed at the information police had leading up to and during the arrest. The government points to the following statement in the Wiles Warrant as justification for the protective sweep.

> To ensure their safety, particularly in light of VILNEUS' statement that a gun was inside the house and the observation of a possible additional occupant looking out the window, agents conducted a brief protective sweep of the apartment.

ECF 82-1 at 12. This is insufficient to justify a protective sweep because the information elicited during the investigation and arrest lacks the specific and

9

articulable facts that "would warrant a reasonably prudent [agent] in believing that [apartment 4-105] harbor[ed] an individual posing a danger to those on the arrest scene." *Hernandez-Mieses*, 931 F.3d at 141 (quoting *Buie*, 494 U.S. at 334).

Here, agents were attempting to arrest Vilneus on a fraud-related warrant; the culmination of a months-long investigation. In that process, agents tracked Vilneus' cell phone, spoke to his mother and brother, and spoke to a neighbor. There were no specific and articulable facts elicited during this investigation that provided agents with a reasonable suspicion of danger at the Coconut Creek apartment. Police knocked on the door, observed someone peek out the window then open the door, and the person at the door immediately identified himself as Vilneus. At that exact moment, the circumstances did not suggest that Vilneus was armed/dangerous, or that he was living with anyone else at the apartment (never mind that person also being armed/dangerous). As the arrest was happening, Vilneus informed officers that he was alone in the apartment and that there was a legally owned firearm in the apartment. There was no information presented to suggest the agents did not believe him. Furthermore, at the suppression hearing, Agent Greene described the arrest and entry into the apartment as happening contemporaneously, meaning it is unlikely that the agents who entered the apartment had the benefit of knowing there was a lawfully owned firearm inside. Moreover, testimony from both agents Nguyen and Greene reflects that the agents searched because of the unknowns associated with executing the arrest warrant. When that timeline is compared to Agent Nguyen's recollection that it took approximately 20–40 seconds to guide Vilneus away

10

from the door and put him under arrest, it becomes clear that the agents who entered the apartment lacked the information about the lawfully owned firearm.

This Court concludes that the information unknown at the time the agents executed the arrest warrant does not amount to particularized reasonable suspicion that someone armed/dangerous was in the house, especially when compared to the facts in *Buie*, *Delgado-Pérez*, and *DaCruz*. The search of the apartment executed at the time of Vilneus' arrest was not, therefore, a valid protective sweep. *See DaCruz*, 694 F. Supp. 3d at 197–98 (rejecting the government's protective-sweep justification under similar circumstances).

## B.   Re-entry

The Court's analysis is not over because agents re-entered the apartment at Vilneus' explicit request.[5] The Court must therefore decide whether the information agents gained from entering apartment 4-105 must still be excised from the Wiles Warrant because the items—cash, debit cards, handgun, etc.—were still in plain-view when agents re-entered apartment 4-105 to retrieve clothes for Vilneus.

The Court finds that the information from the initial warrantless entry need not be excised from the warrant since agents lawfully entered after Vilneus gave consent. *See United States v. Melendez*, 301 F.3d 27, 32 (1st Cir. 2002) (quoting *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973)) (stating "'[o]ne of the

---

[5] At the suppression hearing there was discussion about whether Vilneus asked to get clothes or whether Agent Nguyen asked Vilneus if he wanted clothes. The point is that Vilneus agreed to the agents' re-entry into the residence. Whether he was prompted by the agents or made the request himself does not change the analysis.

11

specifically established exceptions to the [Fourth Amendment] requirements of both a warrant and probable cause is a search that is conducted pursuant to consent.'"). Moreover, the plain view doctrine "permits the warrantless seizure of an item if the officer is lawfully present in a position from which the item is clearly visible, there is probable cause to seize the item, and the officer has a lawful right of access to the item itself." *United States v. Gamache*, 792 F.3d 194, 199 (1st Cir. 2015). The Court notes that the agents could have simply seized those items at the time of re-entry given the nature of the charges and the relation to the observed contraband. *See Horton v. California*, 496 U.S. 128, 133 (1990) (describing as the plain-view doctrine, that, "[i]f an article is already in plain-view, neither its observation nor its seizure would involve any invasion of privacy"). The first-hand observation of the items during the re-entry is separate and independent from the first observation which occurred during the warrantless "protective sweep" entry. The use of the information gained during re-entry and used for the Wiles Warrant application is therefore not an infringement of Vilneus' Fourth Amendment rights. The agents were lawfully in the apartment when they observed the contraband the second time. Therefore, it was proper for the information to be included in the Wiles Warrant affidavit. To the extent the Motion to Suppress argues otherwise, it is denied.

### C. Inevitable Discovery

The government's last argument that there was no Fourth Amendment violation on October 13, 2020 asserts that "the facts before the court fall squarely within the Inevitable Discovery exception to the search warrant requirement." ECF

12

No. 82-1 at 15. The "inevitable discovery doctrine" allows the admission of unlawfully obtained evidence at trial where the "evidence. . . 'would inevitably have been discovered without reference to the police error or misconduct[.]'" *United States v. Hughes*, 640 F.3d 428, 440 (1st Cir. 2011) (quoting *Nix v. Williams*, 467 U.S. 431, 448 (1984)). "Such evidence is admissible 'so long as (i) the lawful means of its discovery are independent and would necessarily have been employed, (ii) discovery by that means is in fact inevitable, and (iii) application of the doctrine in a particular case will not sully the prophylaxis of the Fourth Amendment.'" *Id.* (quoting *United States v. Zapata*, 18 F.3d 971, 978 (1st Cir. 1994)). A colleague in this court applied the following test to determine whether the exception applied: First, it determined whether the decision to seek a warrant was made independently of what was discovered during the illegal entry, and second, whether the affidavit contained a sufficient basis for probable cause when stripped of illegally obtained material. *DaCruz*, 694 F. Supp. 3d at 198-99. The Court finds this test provides a helpful framework to consider the government's argument.

The government was investigating a multi-state fraud operation that involved computers and cell phones. The government argues:

> Law enforcement officers were looking for the Defendant. They had ample evidence that the Defendant had used a cellular telephone to commit the offenses for which he had been charged. Barely dressed when he answered the door without his telephone, law enforcement officers had ample probable cause to search for telephones and the other items related to the fraud as described in Attachment B of the warrant for the TARGET PREMISES (Attached at Exhibit 11), *EVEN WERE THE mention of the CARDS, LAPTOP, MONEY COUNTING MACHINE and CASH*, were excised from the affidavit.

13

ECF No. 82-1 at 18. The defendant suggests that the officers did not even know where Vilneus lived, so how could they show that the items sought might be found in the place they want to search as required for a search warrant. Vilneus argues "[i]t appears that the agents hoped to find evidence of crime in any location frequented by Mr. Vilneus, without any articulable facts to suggest the evidence would be in that location." ECF No. 84 at 6.

Vilneus' argument is unpersuasive because, based on the investigation underway the government would have sought a warrant for these items, and it is reasonable to expect that a computer and cell phone would be located in a place where a Vilneus was living. This is highlighted by the information obtained from the Ping Warrant and from Vilneus' mother. Agents knew Vilneus' cell phone was pinging in the area of apartment 4-105 and his mother explained he moved out of the Rio Pinar address months prior. These facts fit squarely within the bounds of the inevitable discovery doctrine. *See United States v. Soto-Peguero*, 978 F.3d 13, 20 (1st Cir. 2020) (applying the inevitable discovery doctrine because an agent "would have pursued a warrant regardless of what was found in securing the apartment."); *United States v. Scott*, 270 F.3d 30, 42 (1st Cir. 2001) (explaining "the inevitable discovery exception, applies to any case in which the prosecution can show by a preponderance of the evidence that the government would have discovered the challenged evidence even had the constitutional violation to which the defendant objects never occurred.).

14

## IV. CONCLUSION

For the reasons explained above, the Court DENIES Defendant's Motion to Suppress.


IT IS SO ORDERED.

_____
Melissa R. DuBose
United States District Judge


10/07/2025